**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
INTELLIGENT DIGITAL SYSTEMS, LLC and
RUSS & RUSS PC DEFINED BENEFIT
PENSION PLAN, and JAY EDMOND RUSS,          **MEMORANDUM OF**
all individually and as assignees of Jack Jacobs,   **DECISION & ORDER**
Robert Moe, Michael Ryan and Martin McFeely,    12-cv-1209 (ADS)(GRB)
and Jason Gonzalez,
                              Plaintiffs,


                    -against-


BEAZLEY INSURANCE COMPANY, INC.
                              Defendant.
--------------------------------------------------------X

**APPEARANCES:**

**Daniel P. Rosenthal, Esq.**
*Attorney for the Plaintiffs*
543 Broadway
Massapequa, NY 11758

**Ira Levine, Esq.**
*Attorney for the Plaintiffs*
320 Northern Blvd, Suite 14
Great Neck, NY 11021

**DLA Piper US LLP**
*Attorneys for the Defendant*
1251 Avenue of The Americas
New York, NY 10020
        By: Christopher M. Strongosky, Esq., Of Counsel

**SPATT, District Judge**.

        This case arises from a dispute about whether the Defendant Beazley Insurance

Company, Inc. (the "Defendant") is required under a Directors, Officers and Company Liability

Insurance Policy (the "D&O Policy") to indemnify the Plaintiffs Intelligent Systems, LLC

("IDS"); Russ & Russ PC Defined Benefit Pension Plan (the "Plan"); and Jay Edmond Russ

("Russ"), all individually and as assignees of Jack Jacobs, Robert Moe, Michael Ryan and

1

Martin McFeely (collectively the "Plaintiffs") for expenses incurred in participating in an action entitled <u>Intelligent Digital Systems, LLC, et al. v. Visual Management Systems, Inc. et al.</u>, E.D.N.Y. Case No. 09-CV-974 (the "Underlying Action").

On November 27, 2012, the Court issued an order (the "November 27, 2012 Order") converting the Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) to one for summary judgment pursuant to Fed. R. Civ. P. 56, which motion the Court denied.

Following the Court's November 27, 2012 Order, the Plaintiffs filed an amended complaint seeking (i) a declaratory judgment stating that the Defendant must indemnify the Plaintiffs under the D&O Policy for expenses incurred in the Underlying Action; (ii) a declaratory judgment stating that the Plaintiffs have the right to satisfy judgments in the Underlying Action by accessing the D&O Policy; and (iii) an award of compensatory damages for the alleged breach by the Defendant of its obligations to the Plaintiffs under the D&O Policy.

Presently before the Court is (i) a renewed motion by the Defendant for summary judgment to dismiss the amended complaint and (ii) a cross-motion by the Plaintiffs for summary judgment as to their claims. For the reasons set forth below, the parties' motions are denied.

## I. BACKGROUND

Unless stated otherwise, the following facts are drawn from the parties' Rule 56.1 statements. Triable issues of fact are noted.

### A. Parties

The Defendant is an insurance company domiciled in Connecticut with its principal place of business located in Connecticut. (Am. Comp. at ¶ 9; Answer at ¶ 9.) On an unspecified date

in 2007, the Defendant issued the D&O Policy to Visual Management Systems, Inc. ("VMS").
(See Kronley Decl., Ex. 3.)

Prior to its dissolution, non-party VMS was a Nevada corporation, which "maintained an office for the transaction of business in the State of New Jersey." (Am. Compl. at ¶ 12; Answer at ¶ 12.) It was a provider of closed circuit video surveillance technology. (Kronley Decl., Ex. 25.)

The Plaintiff IDS is a Delaware limited liability company with its principal place of business located in Nassau County. (Am. Compl. at ¶ 5; Answer at ¶ 5.) Prior to its merger with the VMS, IDS was "the owner of certain source code and proprietary technology in the area of digital recording for the security industry, and the manufacturer and seller of a proprietary digital video recorder[.]" (Am. Compl. at ¶ 6; Answer at ¶ 6.)

The Plaintiff Russ is an attorney admitted to practice in the State of New York. (Am. Compl. ¶¶ 6–7; Answer at ¶¶ 6-7.) He is the founder and managing member of IDS and the President of Russ & Russ, P.C. ("Russ & Russ"), a New York professional legal corporation with its principal place of business in Massapequa, New York. (Am. Compl. ¶¶ 6–7; Answer at ¶¶ 6-7.) Russ & Russ maintains the Plan. (Id.)

As described in more detail below, on November 10, 2011, VMS assigned its rights and claims under the D&O Policy to the Plaintiffs. (Am. Compl. at ¶ 48; Answer at ¶ 48.)

**B. The Wildon By-Laws**

Wildon Productions, Inc. ("Wildon") is the predecessor to VMS, which was created after the merger transaction described below. The interpretation of Wildon's by-laws is central to resolving the principal question at issue in this case — namely, whether Russ was duly appointed

to the VMS Board of Directors. Thus, it is necessary for the Court to provide background on the requirements for electing individuals to the Board of Directors as set forth in Wildon's by-laws.

On March 12, 2004, Wildon was incorporated under Nevada law. On March 31, 2004, Wildon adopted by-laws (the "2004 By-Laws").

Section 2.1 of the 2004 By-Laws states, "The first Board of Directors shall consist of the number of members set forth in the original Articles of Incorporation. Thereafter, the Board of Directors shall consist of one or more members, the number thereof to be determined from time to time by the Board." The parties do not attach a copy of Wildon's Articles of Incorporation. Therefore, it is not clear how many individuals were initially placed on Wildon's Board of Directors.

Section 2.2 of the 2004 By-Laws further provides:

Each director shall hold office until a successor has been elected and qualified or until his or her earlier resignation or removal . . . . Unless otherwise provided in the Articles of Incorporation or in these bylaws, vacancies and newly-created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, although less than a quorum, or by the sole remaining director.

Section 7.6 of the 2004 By-Laws states that "[t]hese bylaws [sic] may be amended or repealed, and new bylaws [sic] adopted, by the Board of Directors."

On May 9, 2006, Wildon filed a registration statement with the Securities and Exchange Commission ("SEC") in connection with an offering of 5.95 million shares of Wildon's common stock on the OTC Bulletin Board Market. (Kronley Decl., Ex. 13.) OTC refers to "over-the-counter" equity securities that are not listed on a national stock exchange.

Wildon attached to the SEC filing a new set of by-laws (the "2006 By-laws"). (Id.) With respect to the number individual Directors, Section 1(a) of the 2006 By-Laws states,

The first Board of Directors of the Corporation, and all subsequent Boards of the Corporation, shall consist of not less than one (1) and not more than nine (9) directors. The number of Directors may be fixed and changed from time to time by ordinary resolution of the shareholders of the Corporation.

With respect to appointing new directors, Section (1)(b) of the 2006 By-Laws states, "[a] casual vacancy occurring in the Board may be filled by the remaining Directors."

In addition, Section 1(c) of the 2006 By-Laws provides that:

[b]etween successive annual meetings, the Directors have the power to appoint one or more additional Directors but not more than ½ of the number of Directors fixed at the last shareholder meeting at which Directors were elected. A Director so appointed holds office only until the next following annual meeting of the Corporation, but is eligible for election at that meeting. So long as he or she is an additional Director, the number of Directors will be increased accordingly.

On October 5, 2006, the Wildon Board of Directors held a meeting. The minutes of the meeting state:

Be it resolved that the form of Bylaws of the Company as presented to the directors of the Company be adopted and that the Secretary be and is hereby instructed to cause the same to be inserted in the Company's Minute Book immediately following the Articles of Incorporation and the Certificate of Incorporation.

(Kronley Decl., Ex. 23.) However, the by-laws referenced in the minutes were not attached. (The Def. 56.1 Statement at ¶ 27.) Accordingly, it is not clear from the record if the Wildon Board of Directors retroactively adopted the 2006 By-Laws attached to the May 9, 2006 SEC filing or adopted an entirely new set of by-laws.

## C. The Reverse Merger

On June 15, 2007, Wildon, VMS Acquisition Corporation, and Visual Management Systems Holdings, Inc. ("VMS Holdings") entered into a merger agreement (the "Merger Agreement") pursuant to which VMS Acquisition Corp. merged into VMS Holdings (the "Reverse Merger"). (Kronley Decl., Ex. 15, at § 1.1.) Following the Reverse Merger, Wildon

5

became the owner of all of the assets of VMS Holdings and VMS Acquisition Corp. (Id. at §

1.9.)

Further, as a condition of the Merger Agreement, Wildon accepted the resignations of its

current board of directors and was required to "cause" four new individuals "to be elected to the

Board of Directors." (Id. at § 5.4.) The individuals listed in the Merger Agreement were Jason

Gonzalez ("Gonzalez"); Michael Ryan ("Ryan"); Colonel Jack Jacobs ("Jacobs"); and Robert

Moe ("Moe"). (Id. at Ex. D.) Although Moe is listed in the Merger Agreement as a "Director,"

it appears from the minutes of a July 30, 2007 meeting of the Board of Directors described

below, that Howard Herman ("Herman"), and not Moe, was appointed to the Board immediately

following the Reverse Merger. (See Levine Decl., Ex. T.)

On July 17, 2007, Vladimir Barinov, the Secretary of Wildon, signed a certificate in

connection with the Merger Agreement (the "Secretary's Certificate"), in which he attached a

copies of (i) an Amended and Restated Certification of Incorporation (the "Amended

Certification of Incorporation"); (ii) the "Company's By-Laws"; (iii) a resolution adopted by the

Board of Directors; and (iv) a resolution adopted by the shareholders. (Kronley Decl., Ex. 16, at

5; Kronley Decl., Ex. 17, Ex. D at 1.)

Under the terms of the Amended Certificate of Incorporation, Wildon changed its name

to VMS. (Kronley Dec., Ex. 17, Ex. A.) The Amended Certificate of Incorporation further

provided that "[t]he Board of Directors shall have the power to adopt, amend or repeal the By-

Laws." (Kronley Decl., Ex. 17, Ex. A, Art. V.)

With respect to the "Company's By-Laws," the Secretary's Certificate states:

Attached hereto as Exhibit B is a true, correct and complete copy of [VMS's]
Bylaws, as in full force and effect in the form attached hereto as of the date of the
adoption of the resolutions reference in Section 4 and 5 below, and such Bylaws

have not been amended or restated since the date of the date of the adoption of
such resolutions other than as shown in this Certificate.

(Kronley Decl., Ex. 17.)

The by-laws attached to the Secretary's Certificate are the 2004 By-Laws, not the 2006

By-Laws. (Kronley Decl., Ex. 17, Ex. B.) Based on the language of the Secretary's Certificate,

the Plaintiffs assert that VMS adopted the 2004 By-Laws and not the 2006 By-Laws. (The Pls.'

56.1 Statement at ¶ 43.) The Defendant asserts that there is a dispute of fact as to whether VMS

intended to adopt the 2004 By-Laws, as opposed to the 2006 By-Laws. However, it contends

that this dispute of fact is not material because under either set of by-laws, the Plaintiff Russ was

properly appointed to the VMS Board of Directors. (The Def.'s Mem. of Law at 16.)

 Finally, the Secretary's Certificate attached the July 17, 2007 resolutions approving of

the Reverse Merger by the shareholders and the Board of Directors of the newly-formed VMS

entity. (Kronley Decl., Ex. 17, Exs. C and D.) Thus, the Reverse Merger became final on July

17, 2007.

## D.  The July 30, 2007 Board Meeting

On July 30, 2007, the Board of Directors of VMS held a meeting. (Levine Decl., Ex. T.)

The minutes of the meeting state:

> Mr. Gonzalez proposed that each of Roberto Moe and Martin McFeeley be
> appointed to the Company's Board of Directors. Upon motion duly made and
> seconded, [the] Board expanded the Board to five (5) directors and approved the
> appointment of each of Robert Moe and Martin McFeeley to the Board. Mr. Moe
> filled the vacancy created by the expansion of the Board and Mr. McFeeley filled
> the vacancy created by the resignation of Howard Herman . . . . Each of Mr.
> Gonzalez, Colonel Jacobs and Mr. Ryan agreed to remain on the Board and upon
> motion duly made and seconded, the Board approved of their directorships and
> the appointment of Mr. Gonzalez as Chairman of the Board.

(Id. at 2.)  Thus, as a result of the motions passed at the July 30, 2007 meeting, the Board of Directors was increased from four to five members consisting of: Gonzalez, Jacobs, Ryan, Martin McFeeley ("McFeeley"), and Moe.

**E. The Corporate Guidelines**

The Plaintiffs assert that subsequent to the reverse merger on an unspecified date, the Board of Directors adopted an undated document entitled, the "Corporate Governance Guidelines."  (The Pls.' 56.1 Statement at ¶ 66.)  In so doing, they rely on the testimony of Gonzalez, a member of the Board of Directors.  (Id.)  When asked if it was the Board of Directors of VMS who adopted the Corporate Governance Guidelines, Gonzalez testified, "I believe that to be correct."  (Levine Decl., Ex. P at Tr. 81:18–22.)

The introduction to the Corporate Governance Guidelines states:

The Nominating and Corporate Governance Committee . . . of the Board of Directors . . . of Visual Management Holdings . . . has developed, and the Board has adopted, these Corporate Governance Guidelines . . . to assist the Board in the exercise of its responsibilities and to best serve the interests of the Company and its shareholders.  These Guidelines should be interpreted in the context of applicable laws and the Company's articles of incorporation, code of regulations and other corporate governance documents.  The Guidelines are intended to serve as a flexible framework within which the Board may conduct its business and not as a set of legally binding obligations.  The Board may modify the Guidelines from time to time.

(Levine Decl., Ex. U, at 1.)

Relevant to the instant case, the Corporate Governance Guidelines also specify qualifications for nominating an individual to the Board of Directors.  The Guidelines state:

The Company's Code of Regulations provides that all of the directors will be elected annually . . . .  The Nominating and Corporate Governance Committee is responsible for reviewing with the Board, on an annual basis, the appropriate skills and characteristics of Board members as well as the composition of the Board as a whole.  . . . .  Nominees for the Board will be selected by the Nominating and Corporate Governance Committee in accordance with the policies and principles in its charter.  The number of directors is currently fixed,

pursuant to the Company's Code of Regulations, at five. The directors believe that five members is an appropriate size for the Company's Board, but this will be reviewed and modified by the Board periodically to ensure that the Board can efficiently discharge its fiduciary duties and regulatory responsibilities.

(Id.)

The Defendant disputes the contention by the Plaintiff that the Corporate Governance Guidelines were adopted by VMS for three reasons. (The Def.'s Counter 56.1 Statement at ¶ 66.)

First, the Defendant asserts that there is no evidence, such as a formal resolution, that the Corporate Guidelines were adopted by the Board of Directors or the shareholders of VMS. (Id.)

Second, the introduction to the Corporate Guidelines states that the guidelines were developed by the Board of Directors for "Visual Management Holdings," a former subsidiary of VMS that did not exist at the time Russ was allegedly appointed to the VMS Board of Directors. (Id.)

Third, the Defendant relies on the testimony of Philip D. Forlenza ("Forlenza"), Esq., the counsel for VMS during the reverse merger. (Id. at ¶ 66.) When asked if the Corporate Governance Guidelines were adopted, Forlenza testified, "I do not know. I am not aware of them being adopted by the board of directors." (Kronley Decl., Ex. 14, at Tr. 106:18–22.) He also stated that he "generally attended board meetings" and could not recall the Corporate Governance Guidelines ever being discussed. (Id. at Tr. 107:4–9.)

**F. The Acquisition of IDS and the Alleged Appointment of Russ**

On January 4, 2008, VMS entered into a Memorandum of Understanding ("MOU") with IDS, a limited liability company owned and operated by Russ. (Kronley Decl., Ex. 24.) The MOU was "non-binding" and reflected the "understanding upon which the Parties may proceed to closing and consummation of the Transaction." (Id. at ¶ 4.) The "Transaction" referred to

was the sale by IDS of its assets to VMS in consideration for VMS issuing a promissory note to IDS in the amount of $1.5 million.  (Id. at ¶ 1.1.)

Significantly, VMS also agreed that "[t]he management of VMS shall present Jay Russ to the Nominating Committee of the Board of Directors with the full endorsement of the management for selection as a new member of the Board."  (Id.)

On January 31, 2008, VMS entered into a binding Letter of Intent ("LOI") with IDS that substantially incorporated the terms of the January 4, 2008 MOU, including that "[t]he management of VMS shall present Jay Edmond Russ to the Nominating Committee of the Board of Directors of VMS with the full endorsement of the management for selection as a new member of such board."  (Kronley Decl., Ex. 4.)

Under the terms of the LOI, VMS was also required to negotiate a separate agreement with Russ "pursuant to which Jay Edmond Russ would be engaged as a consultant of VMS[.]" (Id. at ¶ 3.1.)  The LOI scheduled the closing of the transaction for March 1, 2008.  (Id. at ¶ 3.3.)

On February 26, 2008, the VMS Board of Directors held a meeting in Red Bank, New Jersey at the law offices of Giordano, Halleran & Ciesla, P.C.  Russ attended the meeting in order to introduce himself to the Board and discuss the transaction.

According to the minutes of the meeting, after discussing the transaction, "Mr. Russ left the room, and after further discussion, upon motion duly made and seconded, the Board approved moving forward with the IDS transaction and appointing Mr. Russ to the Board if the transaction was completed."  (Kronley Decl., Ex. 26, at 3.)

Following the vote, Gonzalez testified that Russ was "invited back in and welcome[d] to the board of directors."  (Kronley Decl., Ex. 25, at Tr. 72:16–23.)  When asked if he informed Russ that he was a member of the board of directors at that time, Gonzalez responded, "Yes."

(Id. at Tr. 73:24–74:2.) Russ testified that following the vote, "I was under the impression that the entire transaction was approved, which would have included me being on the Board." (Kronley Decl., Ex. 5, at Tr. 104:17–20.) He later stated that "the understanding of the transaction was that, when we closed, I would be put on the board. And Jason [Gonzalez] said everything was fine, everything was moving forward." (Id. at Tr. 105:4–7.)

Although the transaction was originally scheduled to close on March 1, 2008, the transaction did not become final until April 2, 2008, when VMS and IDS entered into the final asset purchase agreement. (Kronkley Decl., Ex. 27.) There is a dispute of fact as to whether Russ became a member of the Board of Directors following the closing on April 2, 2008. The Defendant asserts that following closing, Russ became a member of the VMS Board of Directors. (The Def.'s 56.1 Statement at ¶¶ 46.) In making this assertion, it relies principally on the language of the minutes of the February 26, 2008, which as noted above provides, "the Board approved moving forward with the IDS transaction and appointing Mr. Russ to the Board if the transaction was completed."

On the other hand, the Plaintiffs assert that under the 2004 By-Laws, "Russ' alleged appointment was ineffective because the Board did not vote to expand its membership from five persons to six persons, and because additional and further action was necessary to implement the resolution." (The Pls.' Counter 56.1 Statement at ¶ 46.) To support this contention, the Plaintiffs rely on a report filed by their proposed expert, Richard G. Barrier, Esq. ("Barrier"). (Levine Decl., Ex. S.) In his report, Barrier concludes that in order to properly appoint Russ to the Board of Directors, a "formal vote" by the Board of Directors or shareholders of VMS to increase the number of directors from five to six was required. (Id. at 14.) As there was allegedly no formal vote to expand the Board of Directors, Barrier contends that Russ was not

"duly elected or appointed" to the VMS Board of Directors.  (Id. at 16.)  He reached this conclusion based on his review of Delaware and Nevada "case law," the 2004 By-Laws, previous actions by the VMS Board of Directors, and the Corporate Governance Guidelines.  (Id. at 12–14.)

## G. Russ's Involvement with the VMS Board of Directors

On May 16, 2008, Russ sent an email to Frank Schmid ("Schmid"), the controller of VMS, and W. Geoffrey Martin, Esq. ("Martin"), then general counsel for VMS, asking for "proof" that he was a director covered under the D&O Policy.  (Kronley Decl., Ex. 32.)

Martin responded on May 19, 2008, "Please let this email serve as confirmation that as of the next meeting of the Board of Directors of [VMS], you will be a member of said Board of Directors.  Your attendance at our scheduled May 30, 2008 meeting . . . would be greatly appreciated."  (Id.)

On the same day, Russ responded, "Please confirm that I am covered under the D&O Policy recently sent to me.  Coverage probably requires giving notice that I am a Director as of that date, and the payment by VMS of premium, when as billed."  (Id.)

Following the closing of VMS's purchase of IDS, Russ participated in three meetings of the Board of Directors on May 30, 2008, June 10, 2008, and August 29, 2008.  He was also paid for his services as a member of the Board of Directors, though the parties do not specify what his compensation was.

In addition, VMS stated that Russ was a member of the Board of Directors in (i) a June 16, 2008 8-K filing with the SEC; (ii) an annual list of directors and officers filed with the Nevada Secretary of State on September 16, 2008; and (iii) a November 12, 2008 S-1 filing with the SEC.  (Kronley Decl., Exs. 29, 30.)

## H. The D&O Policy

As noted above, on an unspecified date, the Defendant issued the D&O Policy to VMS. (See Kronley Decl., Ex. 3.)  The parties do not attach a copy of the original policy.  Thus, it is unclear when the Defendant first issued a policy to VMS, or Wildon, its predecessor,

On August 11, 2008, VMS renewed the D&O Policy issued by the Defendant for the period September 28, 2008 to September 29, 2009.

Under the terms of the D&O Policy, the Defendant agreed to provide the following insurance coverage to VMS in consideration for a premium payment of $42,500:

> A. The Insurer shall pay on behalf of the Directors and Officers all Loss which is not indemnified by the Company resulting from any Claim first made against the Directors and Officers during the Policy Period for a Wrongful Act provided such Claim is reported in writing to the Insurer as soon as practicable but in no event later than sixty (60) days after the expiration of the Policy Period or the last day of the Optional Extension Period, if purchased.

> B. The Insurer shall pay on behalf of the Company all Loss which the Company is required or permitted to pay as indemnification to any of the Directors and Officers resulting from any Claim first made against the Directors and Officers during the Policy Period for a Wrongful Act provided such Claim is reported in writing to the Insurer as soon as practicable but in no event later than sixty (60) days after the expiration of the Policy Period or the last day of the Optional Extension Period, if purchased.

(Kronley Decl., Ex. 3, at §§ 1(A), (B) (alteration omitted).)

"Claim" is defined as a "written demand for monetary damages or non-monetary relief against any of the 'Insureds.'"  (Id. at §1I(B).)

 "Loss" means the "amounts which the Insureds become legally obligated to pay on account of a Claim, including damages, judgments, any award of prejudgment or post-judgment interest, costs and fees awarded pursuant to judgments, settlement amounts and Costs, Charges and Expenses incurred by any of the Insureds."  (Id. at § II(K)).

A "Wrongful Act" refers to "any actual alleged breach of duty, neglect, error, misstatement, misleading statement, act or omission by . . . any of the Directors and Officers solely in their capacities . . . ." (<u>Id.</u> at §II(X).)

However, the D&O Policy excludes a number of claims from insurance coverage. (<u>See id</u> at § 3.) Relevant to the instant case, Section 3(F) of the D&O Policy states, "The Insurer shall not be liable to make any payment for Loss in connection with or resulting from any Claim . . . by, on behalf of, or at the direction of any of the Insureds[.]" (<u>Id.</u> at § 3(F) (alterations omitted).) This exclusion is referred to by the parties as the "insured versus insured exclusion."

"Insureds" refers to the "Directors and Officers and the Company." (<u>Id.</u> at § II(I) (alterations omitted).)

"Directors and Officers" is, in turn, defined as "all persons who were, now are, or shall be duly be duly elected or appointed directors[.]" (<u>Id.</u> at § II(G).)

As an additional term of the D&O Policy, the "Insureds" agreed that "the statements in the Application are their representations, and that this Policy is issued in reliance upon the trust of such representations." (<u>Id.</u> at § VII(A).) To that end, in the application for renewal of the policy attached to the D&O Policy, VMS stated, "Since the last renewal of the Company's D&O policy the following changes to directors and officers have occurred . . . . Jay Edmond Russ was named to the company's Board of Directors." (<u>Id.</u>)

## I. The Underlying Action

On December 12, 2008, Russ informed Gonzalez and Martin of his decision to resign from the VMS Board of Directors because he was contemplating litigation against VMS in connection with money owed to him under the promissory note executed as part of the Merger

Agreement. (Kronley Decl., Ex. 5, at Tr. 183:20–184:16.) On December 15, 2008, VMS filed a Form 8-K with the SEC to announce Russ's resignation. (Kronley Decl., Ex. 7.)

On February 6, 2009, Russ sent a letter to VMS demanding on behalf of himself, IDS, and the Plan, that VMS pay them $5 million for its alleged negligent actions and omissions, tortious misconduct, fraud, and misconduct in violation of federal and New York State securities laws.

On the same day, Martin forwarded a copy of the letter to the Defendant seeking coverage under the D&O Policy. (Kronley Decl., Ex. 37.)

On March 10, 2009, the Plaintiffs Russ, the Plan, and IDS commenced the Underlying Action in this Court before Untied States District Judge Leonard D. Wexler by filing a complaint against VMS, Gonzalez, Herman, Moe, Ryan, Jacobs, and McFeely. The Plaintiffs asserted claims of negligence, common law fraud, securities fraud, and non-payment of promissory notes issued by VMS to Russ and the Plan.

In a March 17, 2009 letter to Martin, Kristin G. Griffin, Esq. ("Griffin"), an attorney retained by the Defendant, acknowledged receipt of the February 6, 2009 Demand Letter and stated that Peabody & Arnold LLP, her firm, was "currently reviewing the February 6, 2009 demand letter" and that she would contact Martin "shortly with [the Defendant's] coverage position for this matter." (Kronley Decl., Ex. 37.) She stated further:

> We understand from your email that Mr. Russ is a former Director of Visual Management Systems, Inc. We note that as a former Director of VMS, Mr. Russ would be considered an insured under the policy. Thus, any claim he brought against VMS and the other Directors and Officers would trigger Exclusion III F, insured v. insured exclusion and preclude coverage under the policy. We ask that you please provide us with the dates that Mr. Russ served as a VMS board member.

(Id.)

In a March 23, 2009 email to Griffin, Martin responded, "I received your email. Mr. Russ was a member of our board of directors from April 3, 2008 to December 12, 2008. It is clearly our position that Mr. Russ is suing for acts or omissions performed periods during which he was not a board member and therefore your coverage would apply." (Kronley Decl., Ex. 9.)

In a May 27, 2009 letter, the Defendant denied coverage to VMS under the D&O Policy for costs arising from the Underlying Action based on its contention that the "insured versus insured" exclusion applied to Plaintiffs' claims against VMS. (Kronley Decl., Ex. 10 at 3–4.)

On August 30, 2010, Judge Wexler issued a Memorandum of Decision & Order granting summary judgment to the Plaintiff against VMS for breaches of the consulting agreement between VMS and Russ, a promissory note issued by Russ to the Plan, and a separate note issued by VMS to IDS in connection with the Merger Agreement. (Kronley Decl., Ex. 50.) On September 30, 2010, the Court entered judgment against VMS and awarded $1,833,341.65 in favor of IDS; $326,370.18 in favor of the Plan; and $304,144.17 in favor of Russ, plus post-judgment interest at the rate of 9% per year. (Kronley Decl., Ex. 51, at 2–3.)

On an unspecified date shortly after the Court entered judgment against VMS, it filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States District Court of New Jersey. (Am. Compl. at ¶ 40; Kronley Decl., Ex. 41 at 2.) On November 21, 2011, the case was converted from a Chapter 11 action to a Chapter 7 action. (Id.)

In its August 30, 2010 Order, the Court did not rule on two causes of action asserted by the Plaintiff against the individual defendants — Gonzalez, Moe, Ryan, Jacobs, and McFeeley — for (i) negligence and (ii) common law fraud. Thus, these claims remained in the Underlying Action.

On October 6, 2011, Judge Wexler so-ordered a stipulation of settlement entered into by the Plaintiffs and Moe, Ryan, and Jacobs. (Kronley Decl., Ex. 39.) Under the terms of the stipulation, Moe, Ryan, and Jacobs consented to a judgment against them on the Plaintiffs' negligence claim awarding (i) $1.7 million, plus prejudgment interest, to IDS; (ii) $280,000, plus prejudgment interest, to Russ; and (iii) $300,000, plus prejudgment interest, to the Plan. (Id. at ¶ 3.) However, the Plaintiffs agreed to "unconditionally forbear collection" of the judgment against Moe, Ryan, and Jacobs in consideration for their promise to (i) pay the Plaintiff a total sum of $70,000; and (ii) to assign to the Plaintiffs their claims for indemnification under the D&O Policy for costs and expenses incurred in the Underlying Action. (Id. at ¶¶ 4, 8.)

On November 17, 2011, Judge Wexler so-ordered another stipulation settling the Plaintiffs' claims against McFeeley. (Kronely Decl., Ex. 42.) McFeeley consented to a judgment against him on the Plaintiffs' negligence claim awarding (i) $1,833,341.66, plus post-judgment interest, to IDS; (ii) $304,144.17, plus post-judgment interest, to Russ; and (iii) $326,370.18, plus prejudgment interest, to the Plan. (Id. at ¶ 3.) . (Id. at ¶ 3.) The Plaintiffs also agreed to "unconditionally forbear collection" of the judgment against McFeeley in exchange for McFeeley's assignment of his claims for indemnification under the D&O Policy. (Id. at ¶ 4(b).) However, unlike Moe, Ryan, and Jacobs, McFeeley did not agree to pay the Plaintiff any amount of the judgment entered against him. (See id.)

On September 27, 2012, Judge Wexler so-ordered a stipulation of settlement with respect to Gonzalez, the only defendant remaining in the Underlying Action. (Kronley Decl., Ex. 45.) Gonzalez also consented to a judgment against him with respect to the Plaintiffs' negligence claim in the amounts agreed to by McFeeley in the November 17, 2011 stipulation. (Id. at ¶ 3.) Here too, the Plaintiffs agreed to "unconditionally forbear collection" of the

judgment against Gonzalez in consideration for (i) a payment from Gonzalez for $5,000; and (ii) an assignment to the Plaintiffs of his claim for indemnification under the D&O Policy for costs and expenses incurred in the Underlying Action.  (Id. at ¶¶ 4, 8.)

As a result of these stipulations, the Plaintiffs became the assignees of Moe, Ryan, Jacobs, McFeeley, and Gonzalez (the "Insureds") under the D&O Policy.

## J. The Present Action

On March 3, 2012, the Plaintiffs, as the assignees of the Insureds, commenced this action seeking a judgment directing the Defendant to indemnify and pay the sums owed by each of the Insureds to the Plaintiffs in the Underlying Action.

On May 11, 2012, the Defendant moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Plaintiffs' claims.  The Defendant argued that the Plaintiffs failed to state a claim because (i) Russ was a former director of VMS and the D&O Policy explicitly excludes coverage under the "insured versus insured" exemption for lawsuits brought against directors by on or behalf of other directors; and (ii) the Plaintiffs' claims are barred by equitable estoppel because VMS represented to the Defendant that Russ was a director.

The Plaintiffs opposed the Defendant's motion by, among other things, contending that Russ was not duly appointed or elected to the Board of Directors.  Therefore, the Plaintiffs asserted that the "insured versus insured" exemption did not apply to their claims in the Underlying Action.  The Plaintiffs further argued that it was not reasonable for the Defendant to rely on VMS's alleged representations regarding Russ's appointment to the board, and thus, the Defendant could not invoke the doctrine of equitable estoppel.

On November 27, 2012, the Court issued an order converting the Defendant's Rule 12(b)(6) motion into a Rule 56 motion for summary judgment because both parties had

submitted a number of exhibits not included in or referenced to the original complaint. (November 27, 2012 Order, Dkt. No. 32, at 16–17.) The Court found that there were genuine issues of material fact as to whether Russ was duly appointed as a director to VMS's Board of Directors. (Id. at 19–20.) In particular, the Court noted that the parties disputed (i) whether the 2004 By-Laws or the Corporate Guidelines governed the appointment of Directors; (ii) whether the minutes of the February 26, 2008 meeting of the Board of Directors, which the Defendant relied on as evidence of Russ's appointment, were reliable given that they were not approved by the Board; and (iii) whether VMS's Board of Directors needed to take any additional actions after the completion of the Reverse Merger to effectuate Russ's appointment. (Id.) In light of these disputes of fact, the Court found that summary judgment in favor of the Defendant based on the application of the "insured versus insured" exception would be inappropriate. (Id. at 20.)

With respect to the Defendant's equitable estoppel defense, the Court first noted that "'[u]nder New York law, equitable estoppel requires a showing of (1) [a]n act constituting a concealment of facts or a false misrepresentation; (2) [a]n intention or expectation that such acts will be relied upon; (3) [a]ctual or constructive knowledge of the true facts by the wrongdoers; (4) [r]eliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment.'" (Id. at 23–24) (quoting General Elec. Capital Corp. v. Eva Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994)).

The Court found that there were no triable issues of fact as to the first three elements. (Id. at 23–25.) However, the Court found a triable issue of fact as to the fourth element:

> [A] triable issue of fact still exists as to whether the Defendant was justified or reasonable in relying on VMS's and Russ's representations that Russ was a director on the Board. Specifically, a question remains as to whether the Defendant, as a sophisticated insurer, failed to properly investigate VMS's representations that Russ was a Director, particularly in that it failed to seek

additional corporate documents from VMS verifying that Russ was duly
appointed or elected.

(Id. at 25–26.)  Accordingly, the Court declined to grant the summary judgment in favor of the

Defendant on the ground of equitable estoppel.  (Id. at 26.)

On December 26, 2012, the Plaintiffs filed an amended complaint seeking a judgment (a)

"directing the Defendant to indemnify the Insureds under [the] D&O Policy"; (b) "directing the

Defendant pay the sums owed by each of the Insureds to the Plaintiffs arising from the claims,

litigation, stipulations, orders, and/or judgment in the Underlying Action"; (c) "declaring that the

Defendant is a garnishee subject to creditor enforcement rights as to the McFeely Judgment and

as to the Gonzalez Judgment pursuant to New York CPLR Article 52"; (d) "awarding the

Plaintiffs compensatory money damages as assignees of the Insureds arising from the

Defendant's breach of its obligations under the D&O Policy"; (e) "declaring the rights of the

parties under the D&O Policy and each of the Plaintiffs' rights and remedies as against the

Defendant"; (f) "declaring that the alleged claimed basis for disclaimer of coverage by the

Defendant . . . are inapplicable to the facts of this case"; and (g) "the costs and disbursements of

this action."

On December 11, 2012, the Defendant moved pursuant to Local Civil Rule 6.3 for

reconsideration of the November 27, 2012 Order based on what it contended was the Court's

misreading applicable New York law.  (Dkt. No. 42.)  On July 3, 2013, the Court denied the

Defendant's motion.  (Dkt. No. 50.)

Thereafter, the parties engaged in fact and expert discovery, including eleven depositions.

Discovery closed on September 24, 2014.

Presently before the Court is (i) a motion pursuant to Fed. R. Civ. P. 56 by the Defendant for summary judgment dismissing the amended complaint; and (ii) a cross motion pursuant to Fed. R. Civ. P. 56 by the Plaintiffs for summary judgment on their claims.

## II. DISCUSSION

### A. Legal Standards

Fed. R. Civ. P. 56(a) provides that a court may grant summary judgment when the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." James River Ins. Co. v. Power Mgmt., Inc., No. 12–CV–02706 (ADS), ⸺ F.Supp.3d ⸺, ⸺ –, 2014 WL 5460548, at *4 (E.D.N.Y. Oct. 28, 2014) (Spatt, J.) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

"If the movant successfully demonstrates that there is no genuine issue of material fact, then the burden shifts to the non-movant who must come forward with specific facts showing that a genuine issue exists." U.S. ex rel. Keller Painting Corp. v. Torcon, Inc., No. 12–CV–1061 ADS ARL, ⸺F.Supp.3d ⸺, ⸺, 2014 WL 6769234, at *7 (E.D.N.Y. Nov. 29, 2014) (Spatt, J.) (citation omitted).

"A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Reeves v. Anderson, No. 11–CV–3770 SAS, 2014 WL 7336459, at *3 (S.D.N.Y. Dec. 24, 2014) (citing Windsor v. United States, 699 F.3d 169, 192 (2d Cir.2012)). In

determining if a genuine dispute of material fact exists, "the court must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Buckley v. Deloitte & Touche USA LLP, 888 F. Supp. 2d 404, 415 (S.D.N.Y.2012) aff'd, 541 Fed.Appx. 62 (2d Cir. 2013) (citation omitted). However, a party "opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory" or "based on speculation." Id. (citations omitted). In that regard, "[w]here no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir.2011) (internal quotation mark and citation omitted).

## B. Choice of Law

Before reaching the merits of the parties' motions, the Court must first decide what law it will apply to the Plaintiffs' claims for declaratory relief and damages arising from the D&O Policy and the Defendant's equitable estoppel defense.

"Federal courts sitting in diversity look to the choice-of-law rules of the forum state." Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004). "Under the law of New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 433 (2d Cir.2012) (citing In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936, 937 (1993)). "In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." Int'l Bus. Machines Corp., 363 F.3d at 143.

In the November 27, 2012 Order, the Court applied New York law to the Plaintiffs' claims and the Defendant's equitable estoppel defense because "both the parties concede that there is no conflict between New York Law and New Jersey law on the issues presently before the Court." (The November 27, 2012 Order at 17.)

As is made clear below, with respect to the Plaintiffs' claims, the central question at issue is whether Russ was "duly appointed or elected" under VMS's by-laws and articles of incorporation. The parties agree that the Court should apply Nevada law, not New York law, to resolve that issue because VMS is a Nevada corporation and the question of whether Russ's appointment was proper implicates the "internal affairs doctrine."

The "internal affairs doctrine" "'recognizes that only one [s]tate should have the authority to regulate a corporation's internal affairs — matters peculiar to the relationships among or between the corporation and its current officers, directors and shareholders — because otherwise, a corporation could be faced with conflicting demands.'" In re Norstan Apparel Shops, Inc., 367 B.R. 68, 81 (Bankr. E.D.N.Y. 2007) (quoting Roselink Investors, L.L.C. v. Shenkman, 386 F.Supp.2d 209, 225 (S.D.N.Y. 2004)); see also KDW Restructuring & Liquidation Servs. LLC, 874 F. Supp. 2d at 221 (quoting Edgar v. MITE Corp., 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)). As such, "New York courts decide questions relating to corporate internal affairs 'in accordance with the law of the place of incorporation.'" KDW Restructuring & Liquidation Servs. LLC v. Greenfield, 874 F. Supp. 2d 213, 221 (S.D.N.Y. 2012) (quoting Scottish Air Int'l, Inc. v. British Caledonian, 81 F.3d 1224, 1234 (2d Cir. 1996); see also Hilton Head Holdings b.v. v. Peck, No. 11 CIV. 7768 (KBF), 2012 WL 613729, at *6 (S.D.N.Y. Feb. 23, 2012) ("Under the New York choice of law rules, the internal affairs of a corporation are governed by the law of the state of incorporation.").

As VMS is a Nevada corporation and both parties agree that Nevada law governs the issue, the Court will apply Nevada law to determine whether Russ was "duly appointed or elected."  (See the Def.'s Mem. of Law at 14; the Pls.' Reply Mem. of Law at 7.)

With respect to the Defendants' equitable estoppel defense, both parties continue to rely on New York law.  Moreover, the Court sees no conflict between New York and Nevada law as to the elements of equitable estoppel.  Compare In re Harrison Living Trust, 121 Nev. 217, 223, 112 P.3d 1058, 1062 (Nev. 2005) ("[T]he four elements of equitable estoppel: (1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to his detriment on the conduct of the party to be estopped."); with Gen. Elec. Capital Corp. v. Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994) ("Under New York law, equitable estoppel requires a showing of (1) An act constituting a concealment of facts or a false misrepresentation; (2) An intention or expectation that such acts will be relied upon; (3) Actual or constructive knowledge of the true facts by the wrongdoers; (4) Reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment.") (citation omitted).

As such, the Court will apply New York law to the Defendant's equitable estoppel defense and Nevada law to question of whether Russ was "duly elected or appointed" to the VMS Board of Directors.

## C. As to the Insured Versus Insured Exemption

Section 3(F) of the D&O Policy states, "The Insurer shall not be liable to make any payment for Loss in connection with or resulting from any Claim . . . by, on behalf of, or at the

24

direction of any of the Insureds[.]"  (Id. at § 3(F) (alterations omitted).)  Both parties appear to

agree that if Russ is an "Insured" under the D&O Policy, his claims against the former Board of

Directors would fall under this exemption, and therefore, he would not be entitled to

indemnification, as assignee of the Directors.

The D&O Policy defines "Insureds" as the "Directors and Officers and the Company."

(Id. at § II(I) (alterations omitted).)  "Directors and Officers," is, in turn, referred to as "all

persons who were, now are, or shall be duly be duly elected or appointed directors[.]"  (Id. at §

II(G).)  Accordingly, both parties agree that the central question for the Court to resolve in

deciding their present motions is whether Russ was "duly elected or appointed" to the Board of

Directors.

As the Court noted in the November 27, 2012 Order, courts have found a person to be

"duly elected or appointed" to a board of directors if "the procedures by which he was elected

were conducted in a due manner, time, and degree.'"  (The November 27, 2012 Order at 19)

(quoting Julio & Sons Co. v. Travelers Cas. & Sur. Co. of Am., 684 F. Supp. 2d 330, 337

(S.D.N.Y. 2010)); see also Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 412

F.3d 1224, 1229 (11th Cir. 2005) ("[T]he plain meaning of 'duly' clearly indicates that Taylor

was a 'duly' elected officer and director because it is undisputed that the procedures by which he

was elected were conducted in a due manner, time, and degree.").

Here, Russ was allegedly appointed based on the following sequence of events.  First, on

January 31, 2008, VMS entered into a binding Letter of Intent ("LOI") with IDS, pursuant to

which "[t]he management of VMS" agreed to "present Jay Edmond Russ to the Nominating

Committee of the Board of Directors of VMS with the full endorsement of the management for

selection as a new member of such board."  (Kronley Decl., Ex. 4.)  Second, during a meeting of

the Board of Directors on February 26, 2008, "Mr. Russ left the room, and after further discussion, upon motion duly made and seconded, the Board approved . . . appointing Mr. Russ to the Board if the [IDS] transaction was completed." (Kronley Decl., Ex. 26, at 3.) Third, the IDS transaction was completed on April 2, 2008 when both parties signed the final asset purchase agreement, at which point the Defendant asserts Russ became a member of the Board of Directors.

However, the Plaintiffs assert that Russ's appointment was improper under the 2004 By-laws. (The Pls.' Mem. of Law at 16–18.)

Courts construe by-laws as contracts between a corporation's shareholders and therefore apply the rules of contract interpretation in interpreting them. See, e.g., Stewart v. Am. Ass'n of Physician Specialists, No. 5:13-CV-01670 (ODW), 2014 WL 2197795, at *4 (C.D. Cal. May 27, 2014) ("Formal bylaws of a corporation are construed as a contractual agreement between the organization and its members because the enduring relationship between the corporation and its members demonstrates an implied agreement by all parties to abide by the bylaws."); Airgas, Inc. v. Air Products & Chemicals, Inc., 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among a corporation's shareholders; therefore, our rules of contract interpretation apply.") (quoting Centaur Partners, IV v. Nat'l Intergroup, Inc., 582 A.2d 923, 928 (Del. 1990)); Sassano v. CIBC World Markets Corp., 948 A.2d 453, 462 (Del. Ch. 2008) ("Corporate charters and by-laws are contracts among the shareholders of a corporation. Therefore, the rules that govern the interpretation of statutes, contracts, and other written instruments apply to the interpretation of corporate charters and bylaws.") (internal quotation marks and citations omitted). As such, the Court will look to Nevada rules of contract interpretation to interpret the 2004 By-laws.

Under Nevada law, "'in the absence of ambiguity or other factual complexities,' contract interpretation presents a question of law that the district court may decide on summary judgment[.]" Galardi v. Naples Polaris, LLC, 129 Nev. Adv. Op. 33, 301 P.3d 364, 366 (Nev. 2013) (quoting Ellison v. Cal. State Auto. Ass'n, 106 Nev. 601, 603, 797 P.2d 975, 977 (Nev. 1990)). However, "[w]here the meaning of a contract is ambiguous and resort to extrinsic evidence is required to ascertain the intention of the parties, summary judgment is inappropriate in the face of contradictory or conflicting evidence." Margrave v. Dermody Properties, Inc., 110 Nev. 824, 827, 878 P.2d 291, 293 (Nev. 1994) (citing Mullis v. Nevada National Bank, 98 Nev. 510, 513, 654 P.2d 533, 536 (Nev. 1982)).

The initial determination of whether a contract is ambiguous is a question of law for a court to decide. Anvui, LLC v. G.L. Dragon, LLC, 123 Nev. 212, 215, 163 P.3d 405, 407 (Nev. 2007) (quoting May v. Anderson, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (Nev. 2005)). "A contract is ambiguous if its terms may reasonably be interpreted in more than one way[.]" Galardi, 129 Nev. Adv. Op. 33, 301 P.3d 3 at 366 (quoting Anvui, LLC, 123 Nev. 212, 215, 163 P.3d at 407). However, "ambiguity does not arise simply because the parties disagree on how to interpret their contract." Id. (quoting Parman v. Petricciani, 70 Nev. 427, 430–32, 272 P.2d 492, 493–94 (1954)). Rather, "an ambiguous contract is 'an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning.'" Id. (quoting Hampton v. Ford Motor Co., 561 F.3d 709, 714 (7th Cir. 2009)).

Section 2.6 of the 2004 By-laws states, "the vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board unless Articles of Incorporation or these by-laws shall require a vote of a greater number." (Kronley Decl., Ex. 17, at 5.)

Section 2.1 of the 2004 By-laws states, "the Board of Directors shall consist of one or members, the number thereof to be determined from time to time by the Board." (Kronley Decl., Ex. 17, at p. 4.)

Interpreted together, these provisions plainly give the Board of Directors the authority increase the number of Directors by a majority vote.

Section 2.6, the provision at the center of this dispute, states, "Unless otherwise provided in the Articles of Incorporation or in these bylaws, vacancies and newly-created directorship resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, although less than quorum, or by the sole remaining director." (Id. at p. 4.)

The Plaintiff interprets the language, "newly-created directorship resulting from any increase in the authorized number of directors," to imply that the Board must first vote to increase the Board of Directors before it can vote to appoint a new member to the Board. (The Pls.' Mem. of Law at 17.) The Plaintiff then points to the minutes from the February 26, 2008 meeting, which state that "Mr. Russ left the room, and after further discussion, upon motion duly made and seconded, the Board approved . . . appointing Mr. Russ to the Board if the [IDS] transaction was completed." (Kronley Decl., Ex. 26, at 3.) Since there is no indication that the Board of Directors voted to increase the number of Directors, the Plaintiff argues that Russ's appointment was invalid, and he was not "duly elected or appointed" to the VMS Board.

On the other hand, the Defendant interprets Section 2.6 broadly to authorize the Board of Directors to appoint a new director without first voting to increase the number of Directors on the Board. (The Def.'s Mem. of Law at 17.)

28

The Court finds both interpretations of the plain language of Section 2.6 to be plausible. On the one hand, were the Court to read Section 2.6 as broadly as the Defendant does, then the Directors could appoint new directors at any time even if there was no vacancy on the Board of Directors. Such a reading would likely render the provision limiting the appointment authority conferred by Section 2.6 to "vacancies and newly-created directorship resulting from any increase in the authorized number of directors" to be superfluous. This is a result that Nevada courts seek to avoid. See Nev. Dep't of Corrs. v. York Claims Servs., 131 Nev. Adv. Op. 25 (2015) ("In conducting a plain language reading, we avoid an 'interpretation that renders language meaningless or superfluous.'") (quoting In re George J., —— Nev. ——, ——, 279 P.3d 187, 190 (Nev. 2012)); Musser v. Bank of Am., 114 Nev. 945, 950, 964 P.2d 51, 54 (Nev. 1998) ("This interpretation contradicts the principle discussed above, that contracts should be construed so as to avoid rendering portions of them superfluous.") (citing Taylor v. State Farm Mut. Auto. Ins. Co., 175 Ariz. 148, 854 P.2d 1134, 1144, n. 9 (Nev. 1993)).

However, on the other hand, Section 2.6 does not explicitly require the Board of Directors to conduct a separate vote to increase Board members prior to appointing a new member. While the Defendant's interpretation is broad, the Court may not rewrite a provision that appears to be at least arguably ambiguous on its face. See Gary G. Day Constr. Co. v. Clarendon Am. Ins. Co., 459 F. Supp. 2d 1039, 1045 (D. Nev. 2006) ("[A] court will neither rewrite an otherwise unambiguous contract provision nor struggle to find ambiguity where none exists.") (quoting United Nat'l Ins. Co. v. Frontier Ins. Co., 120 Nev. 678, 684, 99 P.3d 1153, 1156 (Nev. 2004)).

Given that both interpretations of Section 2.6 appear to be plausible, the Court finds the provision to be ambiguous as a matter of law. Under these circumstances, summary judgment

for either party is improper.  See Margrave v. Dermody Properties, Inc., 110 Nev. 824, 827, 878 P.2d 291, 293 (Nev. 1994) ("Where the meaning of a contract is ambiguous and resort to extrinsic evidence is required to ascertain the intention of the parties, summary judgment is inappropriate in the face of contradictory or conflicting evidence.").

Generally, in summary judgment proceedings, resort to extrinsic evidence to discern the intent of the parties is improper once the court has determined that the plain meaning of a provision is ambiguous.  See Dickenson v. State, Dep't of Wildlife, 110 Nev. 934, 937, 877 P.2d 1059, 1061 (Nev. 1994) ("If there is an ambiguity requiring extrinsic evidence to discern the parties' intent, summary judgment is improper.").  However, the Court notes that even if consideration of such evidence was appropriate, the extrinsic evidence submitted by the parties in support of their present motions does not clarify the meaning of Section 2.6, nor determine whether it authorized Russ's appointment.

The Plaintiffs submit the following evidence in support of their motion: (a) the opinion of Barrier, their proposed expert; (b) the Corporate Governance Guidelines; and (c) the minutes of a July 30, 2007 meeting of the Board of Directors.  (Id. at 2, 12–14, 16–17.)

First, the Court does not find the report filed by Barrier to be persuasive or admissible. "On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial."  Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).  Thus, it is proper for the Court to rule on the admissibility of an expert report at the summary judgment stage.  See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("The court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment.").

Pursuant to Federal Rule of Evidence ("Fed. R. Evid.") 702, "the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." Bee v. Novartis Pharm. Corp., 18 F. Supp. 3d 268, 300 (E.D.N.Y. 2014); see also Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005) ("Even after determining that a witness is 'qualified as an expert' to testify as to a particular matter, Fed. R. Evid. 702, and that the opinion is based upon reliable data and methodology, Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'")

In addition, proffered expert testimony is subject to Fed. R. Evid. 403, and thus, "'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" Nimely, 414 F.3d at 397 (quoting Fed. R. Evid. 403.)

With respect to the third factor — whether the expert's testimony will assist the trier of fact — the Second Circuit has stated:

> We have consistently held, in that respect, that expert testimony that 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it,' . . . by definition does not 'aid the jury in making a decision'; rather, it 'undertakes to tell the jury what result to reach,' and thus 'attempts to substitute the expert's judgment for the jury's[.]

Id. at 397; see also United States v. Feliciano, 223 F.3d 102, 121 (2d Cir. 2000) ("In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony [that] states a legal conclusion.") (quoting United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)); United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) ("As a general rule an expert's testimony on issues of law is inadmissable.").

Here, Barrier's qualifications are based on his experience currently practicing as an attorney in the "business and finance practice group in Las Vegas" and his prior experience working as in-house counsel for several corporations. (Levine Decl., Ex. S, at 1.) In the report, based on his reading of "persuasive case law," Barrier concludes that a separate vote is required to increase the number of directors prior to appointing a new member to the Board of Directors. (Id. at 13, 15.) This is clearly a legal conclusion, which the Second Circuit has repeatedly held to invade the province of the court. See United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[A]n expert's legal opinion on the meaning of certain contract terms was outside the witness' area of expertise and was also an invasion of the court's authority to instruct the jury on the applicable law.") (citing Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 510-11 (2d Cir. 1977)); United States v. Scop, 846 F.2d 135, 139 (2d Cir.) on reh'g, 856 F.2d 5 (2d Cir. 1988) ("Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions."); Jones v. Midland Funding, LLC, 616 F. Supp. 2d 224, 228 (D. Conn. 2009) ("Because Newburger's opinion contains legal conclusions that impermissibly invade the province of the court, it may not be considered in determining liability [on summary judgment].").

Second, the Plaintiffs assert that VMS "fixed" the number of Directors as "five members as a distinct corporate policy preference when VMS created a corporate governance committee and adopted the Corporate Governance Guidelines." (The Pls.' Mem. of Law at 13–14.)

However, the introduction to the Corporate Guidelines states that the document was created by the "Nominating and Corporate Governance Committee . . . . of the Board of Directors is "intended to serve as a flexible framework within which the Board may conduct its business and not as a set of legally binding obligations." (Levine Decl., Ex. U, at 1.)

It further states:

> The number of directors is currently fixed, pursuant to the Company's Code of Regulations, at five. The directors believe that five members is an appropriate size for the Company's Board, <u>but this will be reviewed and modified by the Board periodically to ensure that the Board can efficiently discharge its fiduciary duties and regulatory responsibilities</u>.

(<u>Id.</u>) (emphasis added). In other words, although the Corporate Guidelines describe the number of Board members as "fixed," they expressly give the Board the authority to "review[] and modify[]" the number. Therefore, the plain language of the Corporate Governance Guidelines does not, as the Plaintiff contends, permanently fix the number of Board of Directors at five, nor do they limit the authority of the Board of Directors to appoint new directors.

Finally, the Plaintiffs rely on the minutes from a July 30, 2007 meeting of the Board of Directors. (The Pls.' Mem. of Law at 12–13.) According to the minutes,

> Mr. Gonzalez proposed that each of Robert Moe and Martin McFeeley be appointed to the Company's Board of Directors. Upon motion duly made and seconded, [the] Board expanded the Board to five (5) directors and approved the appointment of each of Robert Moe and Martin McFeeley to the Board.

(Levine Decl., Ex. T, at 2.)

The Plaintiffs assert that the minutes of the July 30, 2007 establish a "distinct course of conduct" that clarifies the intent of the Board to require the Board to vote to expand the Board of Directors prior to voting to appointing a new member to the Board. (The Pls.' Mem. of Law at 13.) However, the minutes themselves refer to one "motion," not two. Thus, it is unclear whether the Board of Directors did actually conduct two separate votes, as the Plaintiffs contend they were required to do, or whether they conducted one vote to expand and appoint new members, as the Defendant contends they were required to do.

The Defendant relies primarily on its interpretation of the plain language of the Section 2.6 and does not offer extrinsic evidence. Instead, it makes a legal argument that under Nevada

33

law, corporations are only required to "substantially comply" with Nevada law. As such, even if the Board was required to conduct a vote to expand the Board of Directors prior to appointing Russ, the Defendant appears to contend that such a failure should be excused under a "substantial compliance" standard. (The Def.'s Mem. of Law at 15.)

However, the cases cited by the Defendant do not support his assertion that Nevada courts apply a "substantial compliance" standard to the election and appointment of directors. For example, the Defendant relies on Redl v. Sec'y of State, 120 Nev. 75, 81, 85 P.3d 797, 800 (Nev. 2004). There, the issue was whether the Secretary of State of Nevada had discretion to accept an application for the revival of a corporation's charter that did not properly list the names of its directors. Id. at 81, 85 P.3d at 800. The court concluded that the Secretary of State had "the discretion to accept applications that substantially comply with NRS 78.730." Id. The court did not, as the Defendant contends, address the interpretation of a corporation's by-laws, nor indicate a willingness to apply the substantial compliance standard more broadly to corporate governance issues.

Similarly, in Smith v. Kisorin USA, Inc., Nev. Adv. Op. 37, 254 P.3d 636, 637 (Nev. 2011), the issue was whether Nevada Revised Statute § 92A.410(2) requires a corporation seeking to merge with another corporation to provide notice to all stockholders, or only those with dissenters' rights. The court held that such expanded notice was not required based on its interpretation of the statute. Id. at 127 Nev. Adv. Op. 37, 254 P.3d at 640. The court did not refer to "substantial compliance," nor to interpreting a corporation's by-laws. Based on these cases, the Court cannot conclude, as the Defendant contends, that a substantial compliance standard applies.

In light of the ambiguity in the language of Section 2.6 and in the evidence offered by the parties as to what procedures the 2004 By-laws required for the appointment of new directors, the Court finds summary judgment to be inappropriate for either party on the issue of whether the "insured versus insured" exception bars the Plaintiffs' claims.

## D. As to the 2006 By-laws

The Court notes that the Defendant also argues that there is a dispute of fact as to whether VMS adopted the 2006 By-laws, as opposed to the 2004 By-laws discussed above. On July 17, 2007, following the creation of VMS through the Reserve Merger, Barinov, the Secretary of VMS, signed a document certifying that it was attaching "true and correct" copy of VMS's by-laws. (Kronley Decl., Ex. 17.) The by-laws attached to the Secretary's Certificate were the 2004 By-laws, which had been adopted by Wildon, the predecessor corporation to VMS. (Id.)

The Defendant does not dispute that Barinov attached Wildon's 2004 By-laws to the Secretary's Certificate on July 17, 2007. However, it appears to assert that the attachment could have been in error because Wildon, VMS's predecessor, had adopted the 2006 By-laws more recently. (The Def.'s Mem. of Law at 15–16.)

However, the Defendant offers no evidence to contradict Barinov's certification of the 2004 By-laws as the "true and correct" by-laws of VMS. Nor does it offer evidence suggesting that VMS intended to adopt anything other than the 2004 By-laws following the Reverse Merger. Under these circumstances, the Court does not find there to be a triable issue of fact with respect to which set of By-laws would apply. Therefore, the trial should focus solely on the interpretation of the 2004 By-laws in resolving the question of whether Russ was "duly elected or appointed" to the VMS Board of Directors.

**E. As to Equitable Estoppel**

In the alternative, the Defendant argues that Russ should be estopped from denying that Russ was a director to VMS's Board of Directors because VMS had previously represented to the Board and in public filings that Russ was a member of the Board of Directors.  (The Def.'s Mem. of Law at 20.)  In response, the Plaintiffs assert that the Defendant failed to properly investigate Russ's appointment, and therefore its reliance on VMS's representations was not justifiable.  (The Pls.' Mem. of Law 24–26.)

"[E]quitable estoppel is a principle or an affirmative defense that serves to stop another party from denying a material fact."  Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996).  It is "imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought[.]"  Id. (quoting Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 436 N.E.2d 1265 (1982)).

"Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts."  Bild v. Weider, 567 F. App'x 49, 51 (2d Cir. 2014) (quoting In re Vebeliunas, 332 F.3d 85, 93–94 (2d Cir. 2003)).  The party asserting estoppel ─ in this case, the Defendant — "must show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position[.]"  Smith v. Smith, 830 F.2d 11, 12 (2d Cir. 1987) (quoting Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp., 76 A.D.2d 68, 81-82, 430 N.Y.S.2d 179 (1980)).

In the November 27, 2012 Order, the Court found that the Defendant had established the elements of estoppel with respect to the Plaintiff — namely, that there was no dispute that: (i) "VMS represented to the Defendant in its Renewal Application, public filings and correspondence with the Defendant that Russ was a director on VMS's Board and, thus, an insured"; (ii) "there was an expectation that the acts of misrepresentation would be relied upon"; and (iii) VMS had "actual or constructive knowledge" as to whether Russ had been properly appointed to the VMS Board of Directors.  (The November 27, 2012 Order at 24–25.)

The Court further recognized that there was no dispute that the Defendant was prejudiced by the representations of VMS.  (Id. at 25.)  However, the Court found that a triable issue of fact existed "as to whether the Defendant, as a sophisticated insurer, failed to properly investigate VMS's representations that Russ was a Director, particularly in that it failed to seek additional corporate documents from VMS verifying that Russ was duly appointed or elected."  (Id. at 26.)

In its renewed motion for summary judgment, the Defendant asserts that the evidence obtained during discovery establishes that there is no genuine issue of material fact as to whether the Defendant reasonably relied on the representations by VMS that Russ was appointed to the Board of Directors.  (The Def.'s Mem. of Law 20–24.)

In particular, the Defendant relies on a report filed by Dan Bailey ("Bailey"), a proposed expert in the area of D&O insurance and other professional liability insurance and other related matters.  (Kronley Decl., Ex. 55.)  Based on his experience handling "well in excess of 1,000 D&O claims," he concluded that the "insurance industry practice does not require the insurer to undertake a deeper investigation before taking a coverage position and relying upon that coverage position."  (Id. at 6–7.)  Bailey further stated that in his experience, "I do not recall ever

requesting or obtaining shareholder or board resolutions or other evidence which confirmed a person was 'duly elected or appointed' director or officer."  (Id. at 7.)

As noted above, pursuant to Fed. R. Evid. 702, "the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact."  Bee v. Novartis Pharm. Corp., 18 F. Supp. 3d 268, 300 (E.D.N.Y. 2014); see also Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005) ("Even after determining that a witness is 'qualified as an expert' to testify as to a particular matter, Fed. R. Evid. 702, and that the opinion is based upon reliable data and methodology, Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'")  In addition, proffered expert testimony is subject to Fed. R. Evid. 403, and thus, "'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'"  Nimely, 414 F.3d at 397 (quoting Fed. R. Evid. 403).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied [.]"  523 IP LLC v. CureMD.Com, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014) (quoting United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (alterations in original).

With respect to the first element — the qualifications of the purported expert — the witness may be qualified based on "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "[A]ny one of these five forms of qualifications will satisfy the rule[.]  Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007); see also Weinstein's Federal Evidence § 702.04[1][c] (2d ed. 2006) ("A witness can qualify as an expert on the basis of

knowledge, skill, experience, training, or education. Thus, any one or more of these bases should be sufficient to qualify a witness as an expert.") (internal citations and footnotes omitted).

Here, the record reflects that Bailey has over thirty years of experience representing clients with respect to D&O claims, has handled more than 1,000 claims relating to professional liability coverage, and has drafted many of the D&O policies in the market today. (Kronley Decl., Ex. 55, at 1.) Based on this experience, Bailey is clearly qualified to testify as an expert regarding the industry customs of insurance companies in investigating claims. See Tiffany (NJ) Inc, 576 F. Supp. 2d at 458 (finding an expert was qualified because "[t]he record shows that Mr. Mantis has taken courses in statistical sampling through work and various seminars, that he has performed statistical sampling in hundreds of surveys throughout his career, and that he has extensive practical experience in using statistics in litigation.").

Courts have often found that experts who testify as to an industry custom based on their experience in an industry satisfy the second element — reliability — and the third element — whether the opinion will assist the trier of fact. See, e.g., Ling Nan Zheng v. Liberty Apparel Co., 556 F. Supp. 2d 284, 292 (S.D.N.Y. 2008) ("Dr. Greenwald is qualified as an expert on the topic of labor practices in the garment industry based on his extensive publications on this subject, his educational background, and his occupation, as outlined in his curriculum vitae . . . . In addition, his opinions are based on reliable historical data. Finally, his testimony is likely to assist the trier of fact in assessing 'industry custom and historical practice' in the garment industry."); King v. Brandtjen & Kluge, Inc., No. 94-CV-411C(M), 2001 WL 1804345, at *8 (W.D.N.Y. June 20, 2001) ("Schutt's opinions regarding industry custom and practice from the relevant time period are based in objective facts and have traceable analytical bases in those facts. If Kluge does not agree with Schutt's conclusions, it is free to cross-examine him

vigorously regarding the limitations of his experience in the industry and his interpretations of the sources he used.").

The Plaintiff contends that the report by Bailey is inadmissible because it reflect his opinion as to a legal conclusion — namely, whether the Defendant justifiably relied on the multiple representations by VMS and Russ that he was a Director.  (The Pls.' Mem. of Law 22–23.)  As noted above, the Plaintiffs are correct that experts are not permitted to testify as to legal conclusions.  Nimely, 414 F.3d at 397 ("We have consistently held, in that respect, that expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, . . . by definition does not "aid the jury in making a decision[.]") (internal quotation marks, alterations, and citations omitted).  However, the Court does not view Bailey's opinions as legal conclusions.  On the contrary, he makes clear in his expert report that he is opining as to what the industry custom is with regard to investigating claims based on his "more than 30 years of experience with D&O and other professional liability."  As noted in the cases above, such testimony is plainly admissible and stands in stark contrast to the testimony by Barrier, the Plaintiffs' proposed expert, who draws legal conclusions from his reading of "case law" and the 2004 By-laws.  Accordingly, the Court finds the report by Bailey to be admissible at the summary judgment stage.

The Defendant argues that it is entitled to summary judgment based on the expert report of Bailey, which the Plaintiff has not refuted, and the multiple representations made by VMS and Russ, himself, to the Defendant and in public filings that Russ was a Director.  (The Def.'s Mem. of Law at 23.)  The Court finds the evidence submitted by the Defendant to be persuasive and

potentially dispositive.  As such, the Court denies the Plaintiffs' cross-motion for summary judgment on the issue of equitable estoppel.

However, the Court finds summary judgment in favor of the Defendant to be inappropriate because the Defendant relies primarily on Bailey's expert testimony to prove justifiable reliance.  To decide this issue based on Bailey's testimony would require the Court to make a credibility determination, which is improper on a summary judgment motion.  See, e.g., Bee v. Novartis Pharm. Corp., 18 F. Supp. 3d 268, 309 (E.D.N.Y. 2014) ("[T]he Court must step aside to allow the jury to perform its appropriate role, which at this point, will require a probing of the facts and a weighing of the expert's credibility to determine whether Novartis's drugs were a substantial factor in plaintiff's subsequent ONJ development."); Troy v. Unum Life Ins. Co. of Am., No. 03 CIV. 9975 (CSH), 2006 WL 846355, at *11 (S.D.N.Y. Mar. 31, 2006) ("Both elements are questions of fact that cannot be resolved without the Court's making a credibility determination as to the expert opinions present in the record. Such a credibility determination cannot be made on a motion for summary judgment[.]").  Accordingly, the Court also denies the motion by the Defendant for summary judgment on the issue of justifiable reliance.

The Court notes that the only triable issue with respect to the Defendant's equitable estoppel defense is the issue of justifiable reliance.  As noted in the November 27, 2012 Order, the other elements of equitable estoppel have already been established by the Defendant.

### III. CONCLUSIONS

For the foregoing reasons, the Court denies the Defendant's motion for summary judgment dismissing the amended complaint and the Plaintiffs' cross-motion for summary judgment as to their claims.

The Court notes that at the trial, the issues will be limited to: (i) whether Russ was "duly elected or appointed" to the VMS Board of Directors in compliance with the 2004 By-laws, and thus, exempt from indemnification under the "insured versus insured" exemption of the D&O Policy; and (ii) with respect to the Defendant's equitable estoppel defense, whether the Defendant justifiably relied on the representations made by VMS and Russ regarding his appointment.

The parties are directed to file within seven days of the date of this Order a proposed joint pre-trial order for approval by United States Magistrate Judge Gary R. Brown.

**SO ORDERED.**
Dated: Central Islip, New York
June 23, 2015


/s/ *Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge